```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF KENTUCKY
                    CENTRAL DIVISION at LEXINGTON
```

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No. 16-cr-60-JMH |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| | ) | |
| JEFFREY T. WINGATE | ) | |
| | ) | |
| Defendant. | ) | |

                    **    **    **    **    **

This matter is before the Court upon Defendant Jeffrey T. Wingate's Motion to Suppress [DE 11] evidence obtained by Kentucky State Police ("KSP") during a search of his home on December 11, 2015. Wingate contends that KSP used a drug-sniffing dog to conduct a warrantless search of his curtilage, then relied on the dog's positive alert to establish probable cause for the issuance of a search warrant. The United States submitted a Response in Opposition [DE 12], and Wingate declined to file a Reply, making the Motion ripe for the Court's review. On September 19, 2016, the Court held an evidentiary hearing, during which the United States presented testimony from KSP Detectives Darren Allen and Edwin Botkin. At the close of the hearing, the Court orally denied the Motion. This Memorandum Opinion and Order supplements the Court's oral ruling.

1

# I. FACTUAL BACKGROUND

On November 23, 2015, KSP Cannabis Suppression Unit Detectives Darren Allen and Al Eiserman were conducting surveillance at the Lexington Hydroponic Grow Shop. They watched as an unidentified man parked his red Ford F-250 pickup truck, entered the Shop, and purchased several bags of FoxFarm fertilized soil. In their experience, indoor marijuana growers frequent the Shop, often purchasing nutrient-enriched soil like FoxFarm.[1] Suspecting that this man was cultivating marijuana, the detectives asked the KSP dispatcher to run the truck's license plate number, 2323AN, through their database. The dispatcher's search revealed that the truck belonged to Jeffrey T. Wingate, who lived at 115 Bell Court in Nicholasville, Kentucky.

On December 11, 2015, Detectives Allen, Eiserman, and Botkin paid a visit to Wingate's house. As Detective Allen stood on the sidewalk, about ten to fifteen feet away from the front porch, he immediately detected the distinctive smell of green growing marijuana. The smell intensified as he walked towards the house. In fact, it seemed to be emanating from two vents set into the

---

[1] At the evidentiary hearing, Detective Allen testified that this surveillance technique has proved productive for the Cannabis Suppression Unit. Anywhere from 50 to 100 investigations began with surveillance of the Lexington Hydroponic Grow Shop. Approximately 85% of those investigations led to the discovery of marijuana grow operations. He also indicated that FoxFarm fertilizer is particularly popular with marijuana growers.

2

ceiling of the front porch. Detective Allen knocked on the front door of the house, but no one answered.

Meanwhile, Detective Botkin parked his car to the right of Wingate's home and began walking down the sidewalk. From this vantage point, he could see a window air-conditioning unit running on the upper floor of the house, even though it was mid-December. In his experience, marijuana growers often utilize air conditioning units year-round to control the temperature in a closed environment. Once Detective Botkin reached the sidewalk in front of Wingate's home, he too detected the smell of green growing marijuana. He relayed his observations to Detective Allen.

Detective Allen began drafting an application for a search warrant on the scene. In his affidavit, he explained that Wingate had first come to his attention by purchasing FoxFarm fertilizer at the Lexington Hydroponic Grow Shop. Detective Allen detailed his visit to Wingate's home, where he immediately detected the smell of green growing marijuana from the public sidewalk. He also described the vents in the porch ceiling and the window air-conditioning unit running on the upper floor of the house.

While preparing his affidavit, Detective Allen contacted Trooper Kenneth Leveal, who normally patrols the area, and asked him to come to the scene. Detective Allen testified that a uniformed presence is often helpful in such situations and that Trooper Leveal had offered to assist them earlier that day.

Trooper Leveal soon arrived with his drug-sniffing K-9, Bako, and asked if he could deploy him. Detective Allen agreed. Trooper Leveal took Bako up to the porch, where he gave a positive alert to the presence of marijuana. Detective Allen incorporated this fact into his affidavit.

Later that day, Jessamine County District Judge Janet C. Booth issued a search warrant for Wingate's home. In executing the warrant, Detectives Allen and Botkin discovered 147 marijuana plants, several ounces of processed marijuana, and an assortment of illicit firearms.

## II. ANALYSIS

### A. *Legality of the Dog Sniff*

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This language "unequivocally establishes … the right of a man to retreat into his own home and there be free from unreasonable government intrusion." *Payton v. New York*, 455 U.S. 573, 589-90 (1980) (internal quotations omitted). Thus, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 586 (explaining that exigent circumstances may justify a warrantless search or seizure).

The curtilage of the home enjoys the same degree of Fourth Amendment protection as the home itself. *See Oliver v. United*

*States*, 466 U.S. 170, 182, n. 12 (1984) (defining the curtilage as "the area around the home to which the activity of home life extends"). "The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." *California v. Ciraolo*, 476 U.S. 207, 212-13 (1986).

Such protections do not preclude "a police officer not armed with a warrant [from] approach[ing] a home and knock[ing] … because that is 'no more than any private citizen might do.'" *Florida v. Jardines*, 133 S.Ct. 1409, 1415-16 (2013) (quoting *Kentucky v. King*, 563 U.S. 452, 469-70 (2011) (observing that "the occupant has no obligation to open the door or to speak")). Moreover, "when officers walk up to the front door of a house, they are permitted to see, hear, and smell whatever can be detected from a lawful vantage point." *Id.* at 1423; *see also Ciraolo*, 476 U.S. at 213 (explaining that the area within the curtilage "does not itself bar all police observation").

However, a police officer is not permitted to use a trained police dog to further investigate the home and its immediate surroundings from an otherwise lawful position. *Jardines*, 133 S.Ct. at 1417-18 (disapproving of a police officer's decision to bring a drug-sniffing dog up to the front porch of a home while investigating an unverified tip that the homeowner was growing

5

marijuana).  Such activity qualifies as a search within the meaning of the Fourth Amendment.  *Id.*

In this case, Wingate had a Fourth Amendment right to be free from unreasonable searches of his home and curtilage.  Detective Allen did not run afoul of this right when he drove to Wingate's home, knocked on the front door, and smelled green growing marijuana emanating from within.  Similarly, Detective Botkin did not violate the Fourth Amendment when he walked along the sidewalk, observed the window air-conditioning unit running, and detected the smell of green growing marijuana.  However, when Trooper Leveal brought Bako up to the front porch to sniff for marijuana, he conducted a warrantless search of Wingate's home and curtilage.  Because there were no exigent circumstances to justify such a search, the Court concludes that a Fourth Amendment violation occurred.[2]  Thus, the Court must now consider whether it is appropriate to exclude all evidence obtained as a direct or indirect result of the dog sniff.

## B.   *The Scope of the Exclusionary Rule*

The exclusionary rule provides that "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Calandra*, 414 U.S. 338, 347-48 (1974).  This

---

[2] The United States concedes this point in its Response.  [DE 19 at 6].

"judicially created remedy [is] designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the of the party aggrieved." *Id.* Its application "has been restricted to those areas where its remedial objectives are thought most efficaciously served"). *Id.*

For example, the "fruit of the poisonous tree" doctrine contemplates the exclusion of all evidence obtained "as a direct result of an illegal search or seizure," as well as "evidence later discovered and found to be derivative of an illegality." *Segura v. United States*, 468 U.S. 796, 804 (1984) (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)). This doctrine is subject to three exceptions. *Id.* Evidence that is "fruit of the poisonous tree" is not subject to exclusion if: (1) the government learns of the evidence from an independent source; (2) the connection between the evidence and the unlawful search is "so attenuated as to dissipate the taint;" or (3) the evidence would inevitably have been discovered. *See Wong Sun*, 371 U.S. at 487-88 (articulating the first two exceptions); *Nix v. Whiteside*, 467 U.S. 431, 444 (1984) (recognizing the third exception).

The first of these exceptions, commonly referred to as the "independent source rule," authorizes the use of tainted evidence at trial if the government demonstrates that it was discovered through means "wholly independent of any constitutional

violation." *Nix v. Williams*, 467 U.S. 431, 433 (1984). The key inquiry is "whether granting establishment of the primary illegality, [the evidence has] been come at by the exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488.

In *Murray v. United States*, the Supreme Court of the United States considered whether the independent source rule applied to evidence first observed by federal agents during a warrantless entry of private property and later discovered during the execution of a valid search warrant unconnected with the initial entry. *See* 487 U.S. 533, 535 (1988). The Court answered this question in the affirmative. However, it indicated that the independent source rule would not have applied if "the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." *Id.* at 542-43.

Several courts of appeals, including the Sixth Circuit, "have interpreted *Murray* to mean that … for evidence to be inadmissible due to the government's failure to collect it via an independent source, the tainted information presented to the judge must affect the judge's decision in a *substantive*, meaningful way." *United States v. Jenkins*, 396 F.3d 751, 758 (6th Cir. 2005). "[T]he simple fact that an application for a warrant contains information

obtained from an illegal search does not by itself signify that the independent source doctrine does not apply." *Id.* "If the application for a warrant 'contains probable cause apart from the improper information, then the warrant is lawful and the independent source doctrine applies.'" *Id.* (quoting *United States v. Herrold*, 962 F.2d 1131, 1141 (3d Cir. 1992)).

In this case, the Court finds that probable cause existed apart from Bako's positive alert. After all, Detectives Allen and Botkin could smell the "skunk-like" odor of green growing marijuana from the public sidewalk in front of the home. This smell, combined with Wingate's purchase at the Lexington Hydroponic Grow Shop, the oddly-placed porch vents, and the year-round use of the air-conditioning unit, established "a fair probability that a search will result in evidence of a crime being discovered." *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (reaffirming the use of "the totality-of-the-circumstances analysis that traditionally has informed probable cause determinations"). Because the search warrant contained probable cause apart from the dog sniff, the independent source rule saves the evidence discovered at Wingate's home during the execution of the warrant from exclusion.[3]

---

[3] Although the United States does not explicitly rely on *Murray* or *Jenkins*, it uses an approach similar to that adopted in those cases. Specifically, the United States argues that "if the two sentences in the Affidavit regarding the drug dog sniff were removed, … probable cause still existed for the search of the residence." [DE 19 at 6]. However, even if the warrant was not supported by probable cause, the United States insists that the evidence discovered as a result of the warrant is still admissible under the "good faith" exception articulated in *United States v. Leon*. *See* 468 U.S. 897, 913 (1984) (holding

**III. CONCLUSION**

Accordingly, for the reasons stated herein,

**IT IS ORDERED** that Defendant Jeffrey T. Wingate's Motion to Suppress [DE 11] is **DENIED**.

This the 20th day of September, 2016.



Signed By:
*Joseph M. Hood*
Senior U.S. District Judge

---

that "reliable physical evidence seized by officers reasonably relying on a warrant issued by a detached and neutral magistrate … should be admissible in the prosecution's case-in-chief," even if the warrant is ultimately found to be invalid). The United States Court of Appeals for the Sixth Circuit considered the interplay between Leon's "good faith" exception to the exclusionary rule and the "fruit of the poisonous tree" doctrine in a case factually similar to this one. *See United States v. McClain*, 444 F.3d 556, 565-66(6th Cir. 2005). Specifically, *McClain* asked whether evidence discovered pursuant to a search warrant should be excluded because the underlying affidavit included illegally obtained evidence. *Id.* As in *Jenkins*, the Sixth Circuit first considered whether any of the exceptions to the "fruit of the poisonous tree" doctrine saved the evidence from exclusion. *Id.* It answered that question in the negative and then asked whether Leon's "good faith" exception applied. *Id.* This time, the Sixth Circuit answered the affirmative, holding that the evidence obtained as a result of the search warrant need not be excluded. *Id.* In this case, by contrast, the Court need not consider *Leon* because it has already found that the "independent source rule" saves the evidence from exclusion under the "fruit of the poisonous tree" doctrine.